

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF<br><br>JAMES B. JORDAN | 2:23-mc-00154 - PSG<br><br>ORDER OF THE CHIEF JUDGE<br>23-111 |

For the following reasons, restricting the in-person access of James B. Jordan ("Jordan") to the United States Courthouses of the Central District of California is necessary to protect the safety of individuals inside the courthouses, ensure the uninterrupted operations of the Clerk's Office, and preserve the dignity, order, and decorum of the courthouses and all judicial proceedings conducted therein.

I.  Background

   A.   Jordan's Disruptive, Abusive, and Threatening Conduct

Since at least April 2023, Jordan has engaged in disruptive, abusive, and threatening conduct on numerous occasions at the Roybal Federal Building and United States Courthouse ("Roybal") and the First Street United States Courthouse ("FSCH") of the Central District of California.

Order of the Chief Judge 23-111

     i.     April 3, 2023[1]

On April 3, 2023, at Roybal, Jordan requested to speak to a supervisor regarding a complaint about a Court Security Officer ("CSO"). In response, a supervising CSO met with Jordan outside of the Roybal entrance at which time Jordan became irate and uncooperative. As the supervisor attempted to get details of Jordan's complaint, which seemed to be related to a CSO taking too long during the screening process, Jordan became argumentative. The supervisor ended the conversation, told Jordan he would look into the matter, and reentered the building. Jordan then reentered the building and loudly told the CSO to not speak about Jordan with others.

     ii.     April 7, 2023[2]

On April 7, 2023, Jordan was being belligerent and difficult in the Clerk's Office at Roybal, prompting staff to activate the duress alarm summoning CSOs to the Clerk's Office. The CSOs arrived and Jordan was permitted to complete his business in the Clerk's Office, although he continued to be difficult. Jordan was then escorted out of the building.

     iii.     April 12, 2023[3]

On April 12, 2023, Jordan was being belligerent and difficult in the Clerk's Office at Roybal, prompting staff to activate the duress alarm summoning CSOs to the Clerk's Office. Jordan continued to be uncooperative and was eventually escorted out of the building.

     iv.     April 17, 2023[4]

On April 17, 2023, Jordan arrived at the Roybal entrance visibly upset and started being confrontational with the CSOs. The CSOs informed Jordan he would need to be escorted to the Clerk's Office due to his prior conduct. Jordan then became loud and

---

[1] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23107040RB.
[2] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23107040RB.
[3] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23107040RB.
[4] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23107040RB.

belligerent. Members of the Federal Protective Service ("FPS") arrived, escorted Jordan to the Clerk's Office, and then escorted Jordan out of the building.

       v.    May 1, 2023[5]

On May 1, 2023, Jordan was involved in two disturbances at Roybal. The first incident involved Jordan loudly telling a CSO that the CSO did not need to be telling another individual in the courthouse about Jordan after the individual had identified Jordan as the person who frightened her. Shortly after that encounter, while Jordan was being assisted in the Clerk's Office, he became upset because staff accidentally provided Jordan with the incorrect case number before providing the correct case number. Jordan proceeded to berate the staff with insults. Then when Jordan's request for copies was denied per Clerk's Office policy, Jordan yelled and directed profanities at the staff. The staff then closed the intake window and activated the duress alarm summoning CSOs to the Clerk's Office. Jordan continued to call the staff names. Jordan also took photographs of the staff, in violation of Local Rule 83-6.4 and despite there being a sign posted in the office stating that photographs were prohibited. Upon the arrival of the CSOs, Jordan was asked to leave but he refused to do so. FPS then arrived and convinced Jordan to leave. Jordan continued to be loud and disruptive as he made his way through the building to leave.

       vi.    May 3, 2023[6]

On May 3, 2023, after Jordan visited the Clerk's Office at Roybal, he went to a floor of the building where a confidential proceeding was taking place inside a closed courtroom. A CSO was already stationed at a desk on that floor when Jordan arrived. When Jordan walked past the CSO, Jordan asked the CSO what he was looking at and directed profanities and racial slurs at the CSO. As Jordan began walking towards the closed courtroom, an

---

[5] The summary of the events on this date is based on two Court Facility Incident Reports, one logged under # CD23121049RB and the other logged under # CD23121050RB.

[6] The summary of the events on this date is based on two Court Facility Incident Reports, one logged under # CD23123052RB and the other logged under # CD23123052RD.

1  attorney in the hallway told Jordan that he did not believe Jordan could go in the courtroom.
2  The CSO then approached Jordan and told him that he was not permitted in the courtroom.
3  Jordan then told the CSO to shut up and used profanities and a racial slur.  The CSO called
4  additional CSOs for support while Jordan continued to threaten the CSO and make rude,
5  disrespectful, and obscene comments.  Jordan then left the floor.

      vii.    June 2, 2023[7]

On June 2, 2023, Jordan was being belligerent and difficult in the Clerk's Office at Roybal, prompting staff to activate the duress alarm summoning CSOs to the Clerk's Office. Due to Jordan's conduct, staff closed the intake window.  As Jordan approached the closed window, a CSO informed Jordan that the window was closed and advised him to return later. The CSO then attempted to guide Jordan out of the office.  After taking a few steps, Jordan refused to move any further.  Although Jordan was not observed to be pushed, pulled, or intentionally touched by the CSO, Jordan claimed he was assaulted by the CSO and became even louder and more belligerent by making profanity laced comments.  FPS was called. While waiting for FPS to arrive, Jordan made derogatory and racial comments towards Clerk's Office staff and CSOs.

      viii.    June 5, 2023[8]

On June 5, 2023, Jordan entered Roybal and began loudly shouting and accusing a CSO of assaulting him the previous week.  Jordan directed many insults, profanities, and threats of physical violence towards the CSO.  A CSO was able to calm Jordan down and attempted to assist Jordan with passing through the metal detector.  On Jordan's first pass through the metal detector, the detector signaled that Jordan had some type of metal on him. Jordan then removed his watch, and the CSO directed Jordan to walk back through the metal detector.  The CSO told Jordan three times that he needed to go back through the metal

---

[7] The summary of the events on this date is based on four Court Facility Incident Reports logged under # CD23153061RB.
[8] The summary of the events on this date is based on two Court Facility Incident Reports logged under # CD23156062RB.

detector and Jordan refused, so FPS was called. While waiting for FPS to arrive, Jordan directed profanities, racial slurs, and insults towards the CSO. While this disturbance was occurring, some of the individuals present appeared to be concerned for their safety.

FPS arrived and escorted Jordan out of the building. While Jordan was being escorted out of the building, he accused a CSO of using a racial slur against him. Less than an hour after Jordan was escorted out of the building, Jordan returned to the entrance, stood at the threshold, and demanded to enter. A CSO stood in front of Jordan to prevent him from entering the building. Jordan refused to move and blocked the entrance for about 15 minutes, causing other people to be rerouted to the employees' entrance. Eventually, security personnel arrived and removed Jordan from the entrance doorway so that the door could be closed to prevent Jordan from entering. Jordan banged on the exterior windows of the building and yelled profanities at the CSOs before leaving.

   ix. June 9, 2023[9]

On June 9, 2023, at the FSCH, Jordan argued with and directed profanities at Clerk's Office staff creating a loud disturbance, prompting staff to activate the duress alarm summoning CSOs to the Clerk's Office. When the CSOs arrived, Jordan then began to direct profanities at a CSO.

   x. July 14, 2023[10]

On July 14, 2023, Jordan entered the FSCH screening area with a cardboard sign, which was approximately two feet by two feet, and contained an unknown message. Jordan appeared to be asking for donations from persons waiting in line to be screened. Earlier in the week, Jordan had been observed asking for donations from people entering and exiting the courthouse. Jordan then attempted to the enter the courthouse while carrying the sign. At that time, CSOs approached Jordan to inform Jordan that he could not enter with the sign.

---

[9] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23160063FI.

[10] The summary of the events on this date is based on four Court Facility Incident Reports logged under # CD23195077FI and the United States District Court Violation Notice, Number E1864527 (PO23-00323 RAO, Dkt. # 1).

Jordan became extremely loud and argumentative, yelling and raising the sign in front of him. Many people waiting in line appeared to be uncomfortable and intimidated by Jordan's conduct. The CSOs had to close the main security station and divert the line to the secondary station due to Jordan's conduct.

Jordan refused to take the sign out of the building, directed profanities towards the CSOs, and continued to argue with the CSOs. At one point, Jordan stepped towards a CSO, raised the sign towards the CSO, and lunged the sign towards the CSO's face. Believing that Jordan was trying to assault the CSO, the CSO grabbed the sign and disposed of it in a trash can. Jordan continued to argue and began to point and wave his hand inches from a CSO's face, at which time the CSO moved Jordan's hand for safety. Jordan also slapped the hand of a CSO who was trying to prevent Jordan from raising his hand towards another CSO. After Jordan yelled for a few more minutes, eventually court security personnel was able to speak with Jordan and escort him out of the building. Due to this conduct, FPS arrested Jordan, cited him for violating 41 C.F.R. § 102-74-390(b), and transported him off the property. The citation was prosecuted under case number PO23-00323 RAO, *USA v. Jordan*. On September 7, 2023, Jordan withdrew his initial not guilty plea and was ordered to pay a fine of $45 and a mandatory processing fee of $30 to the Central Violations Bureau. *See* PO23-00323 RAO, Dkt. # 17.

    xi. July 19, 2023[11]

On July 19, 2023, Jordan entered the FSCH. During the screening process, Jordan yelled at the CSO to not touch Jordan's things and used profanity. After he cleared screening, Jordan loudly directed insults and profanities towards a CSO and accused the CSO of being the reason why Jordan has been arrested by FPS. Jordan eventually walked away without further incident.

---

[11] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23195077FI.

xii.   July 31, 2023[12]

On July 31, 2023, Jordan approached Roybal and, before entering the building, he raised his middle finger and directed it towards a CSO. As Jordan proceeded to enter Roybal, he loudly requested additional property containers to place his property in before going through the metal detector because he asserted the ones present were dirty. The CSO informed Jordan they would not be giving him additional property containers or anything to clean the property containers. Jordan then requested to speak with a supervisor. A supervising CSO arrived and assisted Jordan with passing through the metal detector. During that time, Jordan directed racial slurs towards the supervisor and continued to be loud and disruptive.

Jordan then walked to the Clerk's Office. At the Clerk's Office, Jordan was loud and disruptive and refused to listen to the staff's directions to leave the intake window and have a seat, prompting staff to activate the duress alarm summoning CSOs to the Clerk's Office. When the CSOs arrived, Jordan was making racial and disparaging remarks towards staff in a loud voice. FPS then arrived and escorted Jordan out of the building.

xiii.   August 7, 2023[13]

On August 7, 2023, while Jordan was in the Clerk's Office at Roybal, Jordan was blocking the entrance of the intake window and threatened to physically assault a staff member.

xiv.   August 28, 2023[14]

On August 28, 2023, Jordan entered the FSCH. Due to Jordan's prior conduct, a CSO was assigned to monitor Jordan. Jordan accused the CSO of harassing Jordan and, in a loud and threatening manner, told the CSO to get away. Jordan then entered a courtroom, which

---

[12] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23212084RB.
[13] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23219086RB.
[14] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23240096FI.

was serving as an overflow courtroom for a criminal sentencing, stayed for approximately five minutes, and left the building.

        *xv.*     *November 6, 2023*[15]

On November 6, 2023, Jordan entered the FSCH and went to the fourth floor. A CSO then went to the fourth floor to escort Jordan and, upon observing the CSO, Jordan directed profanities towards the CSO and threatened to physically assault the CSO. Additionally, while waiting to be assisted by the Clerk's Office staff, Jordan began to verbally harass and insult other court staff who were walking by. Jordan then accused his CSO escort of harassment and asked to file a complaint against the CSO. The CSO escorted Jordan to the third floor of the courthouse so Jordan could make his complaint.

As Jordan was being escorted to the main entrance of the courthouse, FPS arrived and arrested Jordan, cited him for violating 41 C.F.R. § 102-74-390(a), and then released him. Upon Jordan's release, he immediately returned to the courthouse to file a complaint against the United States Marshals Service for being arrested. Jordan was escorted by a CSO at that time.

        B.     <u>Jordan's Recent Litigation</u>

Since March 31, 2023, Jordan has initiated twelve civil lawsuits in the district in which he has sought to proceed in forma pauperis. Ten of the cases have been dismissed shortly after filing pursuant to 28 U.S.C. § 1915(e) because the action failed to state a claim upon which relief may be granted or was frivolous. *See* CV23-02406 DOC (MARx), *James B. Jordan v. Greyhound Lines, Inc.*, Dkt. # 5; CV23-02485 DOC(MARx), *James B. Jordan v. Los Angeles County, et al.*, Dkt. # 17; CV23-03223 DOC(MARx), *James B. Jordan v. Federal Bureau of Investigations*, Dkt. # 10; CV23-04327 DOC(MARx), *James B. Jordan v. Federal Bureau of Investigations*, Dkt. # 10; CV23-04328 DOC(MARx), *James B. Jordan v. Los Angeles County District Attorney*, Dkt. # 5; CV23-06123 DOC(MARx), *James B. Jordan v. Beverly Hills Police Department, et al.*, Dkts. # 5–7; CV23-07121 DOC(MARx), *James B.*

---

[15] The summary of the events on this date is based on a Court Facility Incident Report logged under # CD23310124FI.

*Jordan v. Los Angeles County Department of Children and Family Services*, Dkt. # 6; CV23-07451 DOC(MARx), *James B. Jordan v. United States Attorney's Office*, Dkt. # 9; CV23-08183 DOC(MARx), *James B. Jordan v. Federal Court Security Officers*, Dkt. # 5; CV23-00661 DOC(MARx), *James B. Jordan v. Greyhound Lines, Inc.*, Dkt. # 6.

In the two remaining cases, which have been consolidated, a report and recommendation was issued on October 20, 2023, that recommends dismissing the action with prejudice. See CV23-02480 DOC(MARx), *James B. Jordan v. Los Angeles County Sheriffs, et al.*, Dkt. # 53; CV23-02482 DOC(MARx), *James B. Jordan v. Plaff*, Dkt. # 17 (consolidating the case with CV23-02480 DOC(MARx)).

II. Discussion

Courts have inherent authority to maintain dignity, order, and decorum in judicial proceedings. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.") (quoting *Anderson v. Dunn*, 19 U.S. 204, 227 (1821)); *In re Martin-Trigona*, 737 F.2d 1254, 1261 (2d Cir. 1984) ("Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions."). Such authority logically extends beyond the courtroom to other areas of courthouses where court business is conducted, such as the Clerk's Office. See *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966) ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

When faced with individuals who engage in abusive and disruptive conduct, courts have authority to issue orders restricting the individual's access to courthouses or the manner in which court services may be accessed. See *Huminski v. Corsones*, 396 F.3d 53, 86–87 (2d Cir. 2005) ("[C]ourt administrative, judicial, and other officials must at least have the ability to close the courtroom door to any person whom they reasonably think may pose a threat to person, property, or decorum."); *Mead v. Gordon*, 583 F. Supp. 2d 1231, 1238–44 (D. Or.

2008) (concluding that an order restricting an individual's access to a courthouse due to disruptive behavior did not violate the individual's First Amendment rights). For example, some courts have issued orders restricting litigants' access to courthouses or the manner in which litigants may communicate with court personnel due to abusive and disruptive conduct. *See, e.g., Bittle v. N.C. Unemployment Div. Pandemic*, No. 322CV00499FDWDSC, 2022 WL 15524652, at *2 (W.D.N.C. Oct. 27, 2022) (restricting plaintiff's access to the courthouse because of plaintiff's improper uses of the courthouse, harassing phone calls, and attempted entry with weapons); *Rusk v. Fid. Brokerage Servs., LLC*, No. 215CV00853JNPPMW, 2016 WL 3079713, at *1 (D. Utah May 31, 2016) (prohibiting plaintiff from communicating with court personnel via telephone, email, or facsimile because of plaintiff's "pattern of excessive and abusive communications"); *Delman v. Friedman*, No. CIV.99-20834SW, 2000 WL 1056335, at *3 (N.D. Cal. July 14, 2000) (noting that the court had issued an order barring plaintiff from entering the courthouse for one year because plaintiff's "unscheduled appearance at the courthouse disrupts the work of the clerk's office and causes court employees to fear for their physical safety").

Here, after careful consideration of the circumstances and any potential constitutional rights Jordan may have in accessing the district's courthouses, an order restricting Jordan's in-person access to the courthouses is necessary due to his disruptive, abusive, and threatening conduct outlined above. To start, Jordan's conduct puts the safety of court staff, CSOs, and all other individuals present in the courthouses at risk, both directly and indirectly. Jordan's conduct directly threatens the safety of others because of his threats to physically assault others and his aggressive and disruptive conduct. Jordan's conduct also indirectly threatens the safety of others because his conduct has often disrupted the screening procedures at the entrances of the courthouses, thereby weakening the overall security of the courthouses. Next, Jordan's conduct has repeatedly interrupted the operations and services of the Clerk's Office, impacting not only the litigants and individuals present at the time of the disturbances, but all litigants with cases pending in the district and the public that the Court serves. Finally, Jordan's conduct poses a threat to the dignity, order, and decorum of the

Order of the Chief Judge 23-111

courthouses and all judicial proceedings conducted therein.

The restrictions on Jordan's in-person access outlined below are the least restrictive means of protecting the safety of individuals inside the courthouses, ensuring the uninterrupted operations of the Clerk's Office, and preserving the dignity, order, and decorum of the courthouses and all judicial proceedings conducted therein. Other less restrictive means of addressing Jordan's disruptive and threatening conduct have proved unsuccessful. Clerk's Office staff and security personnel have treated Jordan professionally and attempted to reason with Jordan on multiple occasions in an attempt to avoid disturbances to no avail. Further, Jordan is often not compliant when it is requested that he leave the Clerk's Office or courthouse at the time of his disruptive, abusive, and threatening conduct. Additionally, providing an escort for Jordan during his visits often proves to be counterproductive as the presence of the escort seems to escalate the disruption. The restrictions outlined below are tailored to achieve the demonstrated need and legitimate interest that the Court has in protecting the safety of all individuals inside the courthouses, ensuring the uninterrupted operations of the Clerk's Office, and preserving the dignity, order, and decorum of the courthouses and all judicial proceedings conducted therein while still providing Jordan with access to the Court. There are no less restrictive alternatives available.

III.  Conclusion

For these reasons, to protect the safety of all individuals inside the courthouses, ensure the uninterrupted operations of the Clerk's Office, and preserve the dignity, order, and decorum of the courthouses and all judicial proceedings conducted therein, the Chief Judge orders as follows:

- Jordan is prohibited from entering the United States Courthouses of the Central District of California.
- Jordan may not file documents by personally delivering the documents to the courthouse. Jordan must file documents through other acceptable means, such as by having someone else deliver the documents to the courthouse, United States mail, the Court's Electronic Document Submission System, or electronic

filing via the CM/ECF system.

- If Jordan seeks to enter one of the United States Courthouses of the Central District of California to attend a judicial proceeding, he must file a request to do so under the miscellaneous case number assigned to this Order. The request must be filed at least one week before the proceeding (or explain why the request should be heard on an expedited basis), and state the case number, whether Jordan is a party or witness in the case, the date and time of the proceeding, and the type of the proceeding. The Chief Judge will then rule on the request in consultation with the judge presiding over the case at issue. If Jordan is permitted to enter the courthouse, the Chief Judge may order any necessary precautions, such as an escort for Jordan by security personnel.

Failure to comply with this Order may lead to further sanctions. If Jordan seeks modification of the restrictions outlined in this Order, he may file a petition under the miscellaneous case number assigned to this Order. The Chief Judge will then rule on the petition. The Chief Judge will also consider the continued necessity of this Order every 90 days. Given Jordan's repeated and escalating disturbances over the course of several months, consideration of the continued necessity of this Order at any shorter interval would be unworkable and would undermine the purpose of this Order.

This Order shall be filed under a miscellaneous case number with the title "In the matter of James B. Jordan" and the Clerk of Court shall maintain a miscellaneous docket for the case number. Any subsequent orders and filings in connection with this Order shall be entered on that docket following standard docketing procedures. The Clerk of Court is directed to serve a copy of this Order upon Jordan at his current address of record.

**IT IS SO ORDERED.**

Dated: November 8, 2023

_____
CHIEF UNITED STATES DISTRICT JUDGE

12